Charles PETERSON and Leonard Weston, Plaintiffs,

v.

The COUNTY OF NASSAU, Defendant.

No. 95–CV–2028 (JS).

United States District Court, E.D. New York.

Feb. 23, 1998.

cause to arrest the plaintiffs and therefore the defendant is entitled to judgment as a matter of law.

2) Defendant's police officers are entitled to qualified immunity and the defendant is entitled to state law governmental immunity and therefore judgment as a matter of law for the defendant should be granted.

3) Plaintiffs' counsel's summation was highly prejudicial and grossly improper, warranting a new trial.

4) The jury's verdict was excessive and unsupported by the weight of the evidence.

Joseph Lanni, Dinkes & Morelli, New York, NY, for Plaintiffs.

Taso Kalapoutis, Deputy County Atty., Office of the County Attorney, Mineola, NY, for Defendant.

### MEMORANDUM AND ORDER

SEYBERT, District Judge.

On May 30, 1994, plaintiffs Charles Peterson and Leonard Weston had what can only be described as a less than memorable Memorial Day. Their chance visit to a local Genovese store to purchase medication for Mr. Peterson's sore gums resulted in their unfortunate misidentification and arrest as robbery suspects.

The plaintiffs initiated this action against the police officers involved and Nassau County ("County") under 42 U.S.C. § 1983 and state law claims of false arrest, false imprisonment and malicious prosecution. Only the false arrest claims against the County survived the defendants' motions and were presented to the jury. After deliberating for approximately one hour, the jury returned substantial verdicts of $160,000 for each plaintiff as against the County.

Presently before the Court are the defendant's post-verdict motions for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(b) and for a new trial pursuant to Fed.R.Civ.P. 59. The defendant asserts the following grounds in support:

1) Under the totality of the circumstances, defendant's police officers had probable

## BACKGROUND

Plaintiffs Charles Peterson and Leonard Weston were both employed as Greyhound bus drivers. Tr. 187.[1] Mr. Weston, a Nassau County resident, drove a round trip route from New York to Baltimore, Maryland. Tr. 138. Mr. Peterson, a Virginia resident at the time of the incident, drove a triangular route from Washington, D.C., to Cleveland, Ohio, then on to New York and back to Washington. Tr. 186. The two men met in the summer of 1990, and their friendship developed thereafter. Tr. 187. When Peterson was in New York, he would periodically contact and get together with Weston. Tr. 187. On the particular day in question, Peterson arrived in New York at 7:00 A.M., after driving in from Cleveland. Tr. 189. He was not scheduled to depart to Washington until 9:00 P.M., and he arranged with Weston to join Weston and Weston's family for a cookout. Tr. 190. Peterson took the Long Island Railroad to the Mineola station where he was met by Weston. Tr. 191. Peterson was bothered by sore gums and after Weston stopped at a florist, they proceeded in Weston's black Eagle Tallon to the Genovese store located at the intersection of Hillside Avenue and Herricks Road in Williston Park. Tr. 192–93. They entered the store at approximately 11:00 A.M. and it is from this point forward that the witnesses' descriptions of their actions begin to vary.

---

1. Citations to the trial transcript are denominated Tr. followed by the page number.

## I. THE STORE MANAGER'S VERSION

Lucia Viegas, a vigilant, security conscious store manager was supervising five employees at the Genovese store that morning. Tr. 329. Posted in three locations within the store and accessible only to store employees were police composite drawings—wanted posters—distributed by the corporate headquarters. Tr. 331. During the year leading up to this incident, three Genovese stores were robbed. Tr. 333. An employee of a neighboring Genovese reported spotting in his store one of the individuals wanted for robbery as depicted in the police composite drawing. Tr. 333. Ms. Viegas made sure that all the employees working for her were familiar with the composites and were trained in the store security procedures, in the event of a robbery, or the presence of a suspected robber. Tr. 333. Additionally, the store is equipped with surveillance cameras throughout, feeding six separate monitors, and a silent alarm that can be activated in two different ways. Tr. 334–35. On the date in question, Ms. Viegas was in the manager's booth in the front of the store and she observed Mr. Peterson and Mr. Weston in the cosmetics aisle. Tr. 335. She proceeded toward that aisle to offer assistance and as she approached she noticed their resemblance to the composite drawings. Tr. 336. She walked past them and then returned to glance at them again. Tr. 336. From her vantage, she was able to directly observe them for at least 30 seconds. Tr. 349. Returning to the manager's booth she took a second look at the composites and feeling confident that the plaintiffs were the individuals depicted, Viegas signaled an employee to activate the silent alarm. Tr. 338, 349. Ms. Viegas again walked past the two plaintiffs and confirmed her identification, this time observing the two men looking at the overhead surveillance cameras. Tr. 342. Additionally, Ms. Viegas noticed a small red vehicle parked directly in front of the store doors, matching the color and size of the car described in the composite. Tr. 340–41. At that juncture, she called 911 directly and reported that the men holding up Genovese drugstores could be in the store and that they matched the composites. Tr. 341–42. Immediately thereafter, the police arrived and she personally informed the first officer that the two men in the store matched the composites. Tr. 343. Ms. Viegas then observed the bigger man run from the front of the store towards the rear. Tr. 343. While Ms. Viegas was taking these actions, the plaintiffs were apparently oblivious to it all.

## II. THE PLAINTIFFS' VERSION

### A. CHARLES PETERSON

Mr. Peterson was suffering from sore gums and was looking for an employee to direct him to the proper location of the appropriate medication. Tr. 194. Peterson carried a variety of curatives to the pharmacy section in search of an educated recommendation. Tr. 194. After the counterperson suggested two products, Peterson sought out Mr. Weston. Tr. 196. Weston was at the check out counter and Peterson joined him. Tr. 197. As Peterson was paying for his items at the cash register, a police officer approached and told him to just stand still. Tr. 198.

Mr. Peterson recalled the officer patting down his clothes immediately after he was stopped, and inquiring as to whether he was with Weston. Tr. 199. The officer asked him to sit down at a picnic table on display in the store, and requested identification. Tr. 200. Peterson produced his Virginia driver's license and his Greyhound photo identification and the officer asked him what he was doing in Nassau County. Tr. 201, 202. After he explained his visit, he was not asked any other questions while at the store. Tr. 203. He was informed by the officer that he was being taken to the precinct for questioning, but was not told why, and handcuffs were applied. Tr. 204, 213.

When the police escorted Peterson and Weston out of the store, a crowd had gathered and started clapping and screaming—"Give them the chair." Tr. 212. He was brought to the precinct where he was placed inside a cell for approximately five to ten minutes before being brought upstairs for questioning. Tr. 206, 214. During questioning, he was told why he was being investigated and was shown the police composite sketch. Tr. 206. Afterward, he was brought into a separate room for further questioning

by different detectives, and was handcuffed to a chair where he remained for the duration of his detention. Tr. 216, 219, 220. Additionally, the police took a instant Polaroid photograph of Mr. Peterson. Tr. 217. Approximately 20 minutes before he was released, the handcuffs were removed. Tr. 221. When the plaintiffs were released, Weston's car was at the precinct and it was obvious to Peterson that his bag had been opened and the contents gone through. Tr. 224. After the ordeal, Peterson was unable to drive back to Washington, D.C., and was not paid for the scheduled evening's trip. Tr. 226.

## B. LEONARD WESTON

Meanwhile, Mr. Weston's account of his action's is equally innocuous. Mr. Weston testified that he was browsing the aisles and that he picked up some Gardenia bath gel and some paper plates. Tr. 145. Spotting his favorite stain remover, Spray and Wash, he gathered two bottles and proceeded to the cashier. Tr. 145. While his purchases were being tallied, Weston realized that the Spray and Wash was on sale. Tr. 150. He scampered back to the aisle to buy an additional bottle. Tr. 150. As he began to return to the register, he was stopped by a police officer. Tr. 151.

The officer motioned for him to put his hands up, and then patted him down. Tr. 151, 152. He was then handcuffed. Tr. 153. He was asked for identification and he told the officer that his wallet and keys were in the console of his car. Tr. 155. The officer took his keys out of his pocket and went outside the store with another officer. Tr. 155. When the police escorted him from the Genovese store, there was a large group of people gathered for the Memorial Day Parade, and they were shouting at them. Tr. 157, 163. In the police vehicle, Weston asked why he was being arrested, and he was shown the wanted poster. Tr. 158. At the precinct, he was taken upstairs and handcuffed to a railing. Tr. 167. He was questioned by a detective and a Polaroid photograph was taken, Tr. 169, Weston asked for the photograph, Tr. 171, but it was never returned up until the time of trial. Tr. 171. When he was released, his vehicle had apparently been searched. Tr. 175.

## III. THE POLICE OFFICERS' VERSION

### A. POLICE OFFICER GARY RUGGIERO

Officer Gary Ruggiero testified that he responded to Genovese based on a radio call of a possible robbery in progress. Tr. 254. When he arrived, he initially instructed people outside the store not to enter. Tr. 255. Ruggiero entered the store and proceeded to the manager's booth, located at the front door. Tr. 255. He directly observed people in the store and via the video monitor prior to the manager joining him in the booth. Tr. 255. The manager then instructed him that one of the subjects was in the front of the store, pointing out Mr. Weston on line, and the other was in the back. Tr. 256. He asked Ms. Viegas whether she saw any weapons on the suspects and she indicated no. Tr. 257. Officer Ruggiero also testified that Ms. Viegas informed him that the suspects resembled the police composites, Tr. 257, however, this testimony was inconsistent with and not included in Ruggiero's deposition testimony. Tr. 259. As another officer entered the foyer, Mr. Weston abruptly left the checkout line and went towards the back of the store. Tr. 260, 293. Ruggiero signaled the other officer to enter the store and informed him that the two suspects were in the store toward the rear, and Ruggiero set out to find Mr. Weston. Tr. 265, 293. When Ruggiero spotted Weston, the plaintiff had items in his hand and had turned back in the direction of the cash register. Tr. 266. At that time, Ruggiero directed Weston to stand still, and he frisked him. Tr. 267. Subsequently, he asked Weston for identification and a bus driver's identification and driver's license was produced. Tr. 271. Officer Ruggiero further testified that a copy of the wanted poster was never produced while he was in the store, Tr. 273, however, he believed that Weston resembled one of the suspects in the composite drawing. Tr. 295. At the direction of Sergeant Schoepp, Ruggiero placed Mr. Weston in handcuffs, Tr. 282, and transported and escorted him to the Third Precinct, Tr. 285. Ruggiero handcuffed Weston to the wall in the precinct to await questioning by detectives. Tr. 286. Officer

Ruggiero was aware that Mr. Weston's vehicle was searched by other police officers. Tr. 286.

### B. POLICE OFFICER STEVEN MARKAKIS

Officer Steven Markakis testified that when he arrived at Genovese, Officer Ruggiero was already in the store and had signaled to him to stay in the vestibule. Tr. 77. When Markakis was motioned into the store, Ruggiero informed him that there were two robbery suspects in the store. Tr. 79. Officer Markakis walked up and down the aisles in search of the suspects, and spotted Peterson who looked like one of the individuals in the wanted poster and as described in the radio transmission he heard while responding to the store. Tr. 120, 121, 127. He then approached Charles Peterson who was on line waiting to pay for merchandise. Tr. 81. At that time Markakis asked him to step away from the register and effectively placed him in custody. Tr. 81, 82. Markakis patted-down Peterson, but did not find any weapons. Tr. 121. At the time, Peterson was wearing a black leather hat. Tr. 122. Mr. Peterson was held at the Genovese for approximately 15 to 20 minutes, Tr. 98, and during that time Officer Markakis never saw or asked to see a copy of the wanted poster. Tr. 130. At the direction of Sergeant Schoepp, Markakis and another officer escorted Peterson in handcuffs to the Third Precinct, a distance of approximately half a mile. Tr. 123. Peterson was logged in at the precinct at 11:40 A.M. and was taken to the detective's squad room, where he was seated and handcuffed to the chair. Tr. 125, 127.

### DISCUSSION

In addition to the defendant's motions for judgment as a matter of law and for a new trial, the Court will review the size of the jury award for excessiveness. Although the defendant did not formally move for remittitur, one of the grounds asserted by the defendant in support of a new trial was that the jury verdict was excessive and unsupported by the weight of the evidence. A court may, *sua sponte,* offer a remittitur as an alternative to a new trial. *See Bender v. City of New York,* 78 F.3d 787, 795 (2d Cir.1996); *Williams v. City of New York,* 81–CV–7505, 1989 WL 76208 at *1 (S.D.N.Y. July 6, 1989).

A trial court's review of the size of the jury verdict is not antithetical to the Seventh Amendment's proscriptive language that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const.amend. VII. *See Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 116 S.Ct. 2211, 2222, 135 L.Ed.2d 659 (1996). " 'The trial judge in the federal system has ... discretion to grant a new trial if the verdict appears to [the judge] to be against the weight of the evidence.' " *Id.* (citing *Byrd v. Blue Ridge Rural Elec. Co-op., Inc.,* 356 U.S. 525, 540, 78 S.Ct. 893, 902, 2 L.Ed.2d 953 (1958)). Additionally, "[t]his discretion includes overturning verdicts for excessiveness and ordering a new trial without qualification, or conditioned on the verdict winner's refusal to agree to a reduction (remittitur)." *Id.*

### I. JUDGMENT AS A MATTER OF LAW

Federal Rule of Civil Procedure 50(a) permits a party to move for judgment as a matter of law prior to the submission of the case to the jury and requires that such a motion "specify the judgment sought and the law and the facts on which the moving party is entitled to judgment." Rule 50(b) provides that if the Court does not grant the 50(a) motion, the case is deemed submitted to the jury subject to the Court's later deciding the legal questions raised by the motion and permits renewal of the request for judgment by motion within ten days after the entry of judgment. Thus, the post-judgment Rule 50 motion is merely a renewal of the motion made prior to the submission of the case to the jury, and therefore, is limited to the grounds raised by the losing party in that motion. *Lambert v. Genesee Hospital,* 10 F.3d 46, 53–54 (2d Cir.1993).

At the conclusion of all the evidence, the defendant made a motion for judgment as a matter of law on the issue of probable cause, Tr. 381, and therefore, that issue is properly before the Court. The defendant, however, did not raise qualified immunity, nor govern-

mental immunity, when he proffered the Rule 50 motion. As will be discussed *infra*, qualified immunity does not lie when federal claims are not present, and governmental immunity is inapplicable in police arrest situations, accordingly, this procedural infirmity is inconsequential.

██ A judgment as a matter of law is "reserved for those rare occasions when there is 'such complete absence of evidence supporting the verdict that the jury's finding could only have been the result of sheer surmise and conjecture' or the evidence must be so overwhelming that reasonable and fair minded persons could only have reached the opposite result." *King v. Macri*, 800 F.Supp. 1157, 1160 (S.D.N.Y.1992)(quoting *Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 871 (2d Cir.1992)). The court must view the evidence most favorably to the nonmovant, and then only if one conclusion as to the verdict could have been reached by reasonable persons, in favor of the movant, should the court grant judgment as a matter of law. *See Weldy v. Piedmont Airlines, Inc.*, 985 F.2d 57, 59–60 (2d Cir.1993). The court should not substitute its own factual assessment of the evidence for the jury's, rather, it should decide whether reasonable persons could not draw the same conclusion as the jury.

A. PROBABLE CAUSE

██ The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right. *See Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991). Under New York law, a plaintiff claiming false arrest must show: (1) the defendants intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement and did not consent to it; and (3) the confinement was not otherwise privileged. *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir.1996) (citing *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93,, 335 N.E.2d 310 *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975)).

██ The existence of probable cause gives an officer the privilege to arrest and "is a complete defense to an action for false arrest." *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir.1994). "Whenever there has

been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful." *Broughton*, 37 N.Y.2d at 456, 373 N.Y.S.2d at 94, 335 N.E.2d 310.

██ "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996); *see also Dunaway v. New York*, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979); *Wong Sun v. United States*, 371 U.S. 471, 479, 83 S.Ct. 407, 412–13, 9 L.Ed.2d 441 (1963).

██ However, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The validity of an arrest does not depend upon an ultimate finding of guilt or innocence. *See Pierson v. Ray*, 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967). Rather, the court looks only to the information that the arresting officer had at the time of the arrest. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987).

██ Whether probable cause existed or not may be determined as a matter of law "if there is no dispute as to the pertinent events and the knowledge of the officers." *Id.* For example, in *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118–19 (2d Cir.1995) *cert. denied*, 517 U.S. 1189, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996), the Second Circuit affirmed the summary dismissal of the false arrest claim on the ground that there was probable cause for the arrest because the officer was directly advised by the store owner who was present during the crime and knew the criminal's identity, and the owner's veracity was not in doubt. *Id.* at 119.

██ Conversely, "[w]here the question of whether an arresting officer had probable

cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury." *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997); *see also Moore v. Comesanas,* 32 F.3d 670, 673 (2d Cir.1994); Restatement (Second) of Torts § 673(2)(a) & comment h (1977).

■ At trial, one of the two officers that took the stand was indecisive as to the probable cause basis for the arrest of the plaintiffs. Police Officer Gary Ruggiero was the first officer to arrive on the scene in response to a radio call of a possible robbery in progress. Tr. 254. He spoke with Ms. Viegas who informed him that one of the subjects was in the back of the store and pointed out Mr. Weston on line. Tr. 256. She also told Ruggiero that she had not seen any weapons, but that they resembled the composites and had been acting a little strange in the store. Tr. 257. At the direction of Sergeant Schoepp, who arrived minutes later, Ruggiero handcuffed Mr. Weston. Asked at trial about his answer to the following question at a deposition: what was the reasonable suspicion that justified bringing Weston in for questioning, Ruggiero replied, I think you would have to ask Sergeant Schoepp, Tr. 283, and that Sergeant Schoepp made the decision. Tr. 284. The defense did not call Sergeant Schoepp, the ranking officer on the scene, to testify as to the probable cause basis for the arrests.

Police officer Steven Markakis, the second officer on the scene, entered the store at the direction of Police Officer Gary Ruggiero. Tr. 78. Officer Markakis approached Peterson, patted him down and found no weapon. Tr. 82. Officer Markakis handcuffed Peterson, although he had not observed him doing anything illegal. Tr. 83. Markakis testified that he apprehended Peterson based on the radio transmission he received en route of a robbery in progress at Genovese, indicating the suspects were still in the store, and that they matched the description of the robbery suspects listed on the wanted poster, in addition to his assessment of the physical resemblance of Peterson to his recollection of the wanted poster. Tr. 115, 122. Subsequently, Sergeant Schoepp directed Markaksis and another officer to escort Mr. Peterson to the Third Precinct. Tr. 123.

The plaintiffs do not suggest, and it cannot be refuted, that the actions taken by the police in responding to the silent alarm and the telephone report of a robbery in progress at Genovese were proper. Additionally, the initial detention of the plaintiffs in the store was not violative of their rights. As the level of policing escalates, the competing considerations of "the indisputable right of persons to be free from arbitrary interference by law enforcement officers and the nondelegable duty placed squarely on the shoulders of law enforcement officers to make ... [society] reasonably safe for us all" *People v. Chestnut,* 51 N.Y.S.2d 14, 431 N.Y.S.2d 485, 488, 409 N.E.2d 958 (1980), collide. As the level of intrusion increases, the police must be able to articulate specific facts from which rational inferences of criminal activity can be drawn. Thus, although reasonable suspicion was present to support the initial detention, there remains the issue of whether the subsequent arrest and transportation of the plaintiffs to the precinct, and the three hours held in police custody were valid. *See People v. Hicks,* 68 N.Y.2d 234, 238, 508 N.Y.S.2d 163, 165, 500 N.E.2d 861 (1986).

■ "Even without a technical formal arrest, a suspect's detention may in fact be the equivalent of an arrest, requiring probable cause." *Id.,* 68 N.Y.2d at 239, 508 N.Y.S.2d at 166. Unfortunately, one cannot readily map out the facts on a grid to determine when the police have effectuated a lawful seizure, or, an arrest requiring probable cause. Each case must be considered on its own merits, based on the information available to the police throughout the interval of detention. The proper inquiry is " 'what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position' " and not the wholly subjective belief of the officer or the arrestee. *Id.* (citation omitted).

In the instant action, the plaintiffs were detained at the store and patted down, placed in handcuffs and transported to the precinct without initially being informed of the nature of the charges under investigation. They were questioned and kept at the precinct for approximately three hours. Additionally, a warrantless search of plaintiffs'

vehicle was performed. *Compare Hicks*, 68 N.Y.2d at 240, 508 N.Y.S.2d at 166, 500 N.E.2d 861 (suspect was not handcuffed and was peacefully taken by the police to the crime scene, not the precinct, for a limited period of time, for a specific purpose of which he was informed; this constituted a lawful detention and not an arrest) *with Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979)(suspect was taken into custody, not free to leave and taken into custody by the police, transported to the precinct and interrogated; this constituted an arrest without probable cause). The determination does not turn on whether the suspect was told he was under arrest or formally charged. *Dunaway*, 442 U.S. at 212. The issue is not before the Court because the County concedes that Peterson and Weston were arrested.

■ In *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), the Supreme Court articulated the following guidelines for determining if the actions taken by the police were reasonable and lawful: (1) whether the officer's action was justified at its inception, (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first place; and (3) whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant. *Id.* 105 S.Ct. at 1573–1575.

As mentioned earlier, the officers' actions were initially justified. Moreover, the report of a burglary in progress in conjunction with a tentative identification based upon a police composite drawing, warranted additional investigation into the identity of the plaintiffs. Because the officers did not have probable cause to arrest the plaintiffs at Genovese, they were under a duty to investigate the matter in an expeditious fashion, consistent with safety and proper police procedure, to ensure the duration of plaintiffs' detention would be limited.

This was not an instance where probable cause was initially established, and affirmative investigatory measures were not taken by the police which could have exculpated the arrestee. In those situations, once probable cause is established, the police do not have to endeavor to negate it. *See Baker v. McCol-*

*lan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2696, 61 L.Ed.2d 433 (1979); *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir.1989); *Bassett v. Ferrucci*, No. 94–CV–655, 1996 WL 347207 at *4 (N.D.N.Y. June 19, 1996); *Gonzalez v. City of New York*, No. 94–CV–7377, 1996 WL 227824 at *8 (S.D.N.Y. May 3, 1996); *Dukes v. City of New York*, 879 F.Supp. 335, 341 (S.D.N.Y.1995)("Even if the basis of the arrest could have dissipated, subsequent to the arrest ... such an occurrence does not eliminate the probable cause that existed at the time of the arrest.").

■ This also is not an instance in which the police justifiably relied upon the testimony of an eyewitness or a crime victim. An unequivocal identification of a suspect received by police from a victim or eyewitness can provide probable cause. *See, e.g., Singer*, 63 F.3d at 119; *Thomas v. Culberg*, 741 F.Supp. 77, 80 (S.D.N.Y.1990). Under those conditions, even "[a]ssuming the information ... relied upon was wrong, probable cause exists even where it is based upon mistaken information, so long as the arresting officer was reasonable in relying on that information." *Bernard*, 25 F.3d at 103, *citing Colon v. City of New York*, 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455–456, 455 N.E.2d 1248 (1983).

In the case at bar, the police responded to reports of a robbery in progress, and to Ms. Viegas' initial account of the police composite suspects presence in the store. Because Ms. Viegas had never seen the actual robbers, the sole basis of Ms. Viegas' identification was her evaluation of the composite drawing as compared with the plaintiffs. Therefore, once the plaintiffs' were detained in the store and no criminal activity was detected, Ms. Viegas' assessment of the plaintiffs' resemblance to the poster lacked any inherent value. The police are trained and have more experience than a bystander in ascertaining the identity of possible suspects.

Officers Ruggiero and Markakis each testified that the wanted poster, with the picture and identification of the suspects, was never reviewed by the police in the store—although it was posted in three locations in the store and was available in the patrol car—to assist the officers in their identification of the plain-

tiffs. The Court notes that the police composite drawings were likenesses derived from witness' accounts of the actual robbers, and therefore, the sketch and the pedigree information contained therein were only estimates and not precise. Accordingly, a variance between the plaintiffs and the suspects as depicted in the drawings, would not automatically conclude the investigation. Moreover, the suspected robbers' identities were not known to the police, limiting the probative value of the plaintiffs' driver's licenses and photo identifications.

However, notwithstanding the above, and even assuming there was a facial and body type similarity between the plaintiffs and the poster, the factual dissimilarities should have indicated to the police that the plaintiffs were probably not the robbery suspects. The modus operandi of the men wanted as exactly reported in the poster was "a series of fast food restaurant robberies along with other commercial businesses located within Nassau County since 1994." Tr. 88. It was further reported that: "Subject either confronts manager in parking lot of restaurant after closing or enter premise shortly before closing time." Tr. 89, 90. "Subject displayed weapons and have store manager remove U.S. currency from store safe." Tr. 89. "Subjects place U.S. currency in a dark colored duffle-type bag and flee store with loss." Tr. 89, 90.

The physical description reported on the poster was "subject number one, male black, late twenties to early thirties, five foot ten to six foot, 200 pounds, stocky build, medium complexion, short black hair. May have a few days growth of hair on his face. Subject armed self with a snub-nose type revolver or silver handgun, .22 caliber type." Tr. 89. "Subject number two, male black, late twenties to early thirties, six foot, 160 to 180 pounds. Subject has been referred to by the name Chico, by subject number one. Subject is also armed with a handgun." Tr. 89. The suspects' vehicle was reported as "a small red compact auto, possible Honda type vehicle." Tr. 89.

After a while at the Genovese store, the police should have been aware that: (1) a restaurant was not involved; (2) the store was not about to close; (3) the manager was not approached or confronted; (4) the plaintiffs were not in possession of handguns; (5) they were not in possession of a dark colored duffle-type bag; (6) neither was named Chico; (7) they did not drive a small red compact; and (8) their actions within the store were entirely consistent with everyday shoppers, and therefore, they were not attempting to commit a robbery.

However, it was still feasible that the plaintiffs were the suspects depicted in the poster, out shopping. The Court finds it quite telling that the officers never compared the suspects to the poster while in the store. The poster's broad range description provided for a large number of potential matches.

Mr. Peterson was considered by the officers to match subject number two. Tr. 127. Mr. Peterson's physical description as indicated by the officers was five feet ten inches tall, Tr. 92, and weighing 150 pounds, Tr. 128. At the time of the arrest he was 32 years of age. Tr. 185. The wanted poster described subject number two as late twenties to early thirties, six feet tall and between 160 to 180 pounds.

Mr. Weston was considered by the officers to match subject number one. Tr. 263. Mr. Weston described himself as being six feet two inches tall and weighing 230 at the time of the incident, when he was 40 years old. The wanted poster described subject number one as late twenties to early thirties, five feet ten to six feet, weighing 200 pounds with a stocky build.

Based upon the foregoing testimony, the Court cannot conclude that the officers had probable cause as a matter of law to arrest the plaintiffs when they left the Genovese store. *See Johnson v. City of New York,* 940 F.Supp. 631, 636 (S.D.N.Y.1996). In *Johnson,* the police were informed by a police dispatcher that there was a warrant out for the arrest of a "Steven Johnson" of the same race as Johnson. The subject was described by the dispatcher as 5 feet, ten inches tall, 170 pounds. The Plaintiff Johnson stands 5 feet, 6 inches tall, and weighs 145–150 pounds. A question of fact remains for the jury regarding whether reasonable officers could disagree over whether probable cause existed to arrest the Plaintiff, given the significant disparity between the height and

weight of the subject of the warrant, and the height and weight of the Plaintiff. *Id.*

Furthermore, the County failed to elicit any testimony from the officers as to the reason they were taken to the precinct, or to the investigation carried out there. *See Rodriguez v. City of New York*, 149 Misc.2d 295, 297, 563 N.Y.S.2d 1004, 1006 (1990)("Defendant has offered the court no reasonable explanation as to the necessity of bringing Rodriguez back to the present. . . . Therefore Rodriguez has sufficiently proven the issue of liability for the false arrest claim").

In fact, the County never called as witnesses the detectives or superior officers involved in the actual investigation, or those who ultimately decided to release the plaintiffs. As such, the jury and the Court were never informed of the investigative measures taken by the police. Such information may have justified the length of detention. If, for arguments sake, the police conducted a line-up with eye-witnesses of the prior robberies, such action would be consistent with further investigation only available at the precinct. However, beyond the plaintiffs' testimony that they were asked basic questions at the precinct, we do not know what the police did to ascertain the plaintiffs' absence of guilt. Accordingly, the jury was free to infer that the measures taken in furtherance of the investigation did not warrant a three hour detention.

In light of the paucity of evidence presented by the County, and because the profoundly factual issue of the plaintiffs' identity and their resemblance to the suspects was critical to the determination of probable cause, it was properly presented to the jury. *See, e.g., Fassett By and Through Fassett v. Haeckel*, 936 F.2d 118, 120–21 (2d Cir.1991); *Smith v. County of Nassau*, 34 N.Y.2d 18, 25, 355 N.Y.S.2d 349, 311 N.E.2d 489 (1974). This was not a situation where reasonable jurors could not draw the same conclusion as the jury, and therefore, the extraordinary remedy of judgment as a matter of law shall not issue.

## B. QUALIFIED IMMUNITY

The defendant asserts immunity from suit under the doctrine of qualified immunity. Qualified immunity is an affirmative defense which, if proven, "shield[s] [govern-ment agents] from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 116 S.Ct. 834, 838, 133 L.Ed.2d 773 (1996)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)).

Because the Court dismissed plaintiffs' constitutional claims, however, the Court need not address the issue of whether or not the defendant is entitled to invoke the defense of qualified immunity. The defendant so much as acknowledges this fact in the second footnote of the Memorandum of Law in Support of Defendant's Motion for Judgment As a Matter of Law, which states "[s]ince most actions for false arrest, whether brought in state or federal court, include a federal claim under Section 1983, entitling the actor to qualified immunity under federal law . . ." Absent a federal constitutional cause of action, there is no qualified immunity defense available.

Moreover, qualified immunity only protects officers from liability in suits against officials in their personal capacity. It is not available in a suit against officials acting in their official capacity, *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Cartier v. Lussier*, 955 F.2d 841, 844 (2d Cir.1992), or when the officials are no longer named parties.

## C. GOVERNMENTAL IMMUNITY

The defendant contends that it is entitled to immunity under the common law doctrine of governmental immunity. As described in *Haddock v. City of New York*, 75 N.Y.2d 478, 484, 554 N.Y.S.2d 439, 442, 553 N.E.2d 987 (1990) "[g]overnmental immunity under the decisional law of this State does not attach to every act, but when official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant generally is not answerable in damages for the injurious consequences of that action." *Id.*

However, municipal immunity does not encompass the actions of police officers. Police officers only enjoy absolute immunity when testifying as witnesses. *Briscoe v. LaHue*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). The Supreme Court addressed the scope of immunity available to a police officer, and rejected the argument that police officers should be absolutely immune when seeking an arrest warrant. The Court first disposed of the analogy to complaining witnesses who enjoy absolute immunity, because complaining witnesses were not absolutely immune at common law, *Malley v. Briggs*, 475 U.S. 335, 342, 106 S.Ct. 1092, 1097, 89 L.Ed.2d 271 (1986) and, of course, neither were police officers. Then, the Court dismissed the argument that policy considerations require absolute immunity for the officer, finding the protections available under qualified immunity sufficient to avoid excessive disruption of government. *Id.*

The New York Court of Appeals in *Arteaga v. State*, 72 N.Y.2d 212, 219, 532 N.Y.S.2d 57, 61, 527 N.E.2d 1194 (1988) expressed this sentiment when it stated "we cannot accept the view of the dissent that actions of correction officers are comparable to the actions of police officers, who under established law are entitled only to qualified immunity." *Id.* (holding State had absolute immunity for acts of state correctional facility employees who were in full compliance with governing statutes and regulations and whose actions constituted discretionary conduct of quasi-judicial nature). Accordingly, the County is not entitled to absolute or governmental immunity for the actions of its police officers when an arrest was effectuated without probable cause.

## II. MOTION FOR A NEW TRIAL

A motion for a new trial pursuant to Fed.R.Civ.P. 59(a) affords the trial court more latitude than a decision on a motion for judgment as a matter of law. The rule provides that "[a] new trial may be granted to all or any of the parties on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." *See, e.g., Holzapfel v. Town of Newburgh, N.Y.*, 950 F.Supp. 1267, 1272 (S.D.N.Y.1997) ("a less stringent standard applies to a motion for a new trial than to a motion for judgment as a matter of law") (citations omitted).

In comparison to the standard for judgment as a matter of law, a "trial judge hearing a motion for a new trial is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *Song v. Ives Labs.*, 957 F.2d 1041, 1047 (2d Cir.1992) (citation omitted). Yet, the Second Circuit has specifically instructed that a trial court should only grant such a motion when convinced that the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice. *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970 (2d Cir.1987). Whether to grant a motion for a new trial lies within the discretion of the trial court. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); *Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 133 (2d Cir.1986).

It is firmly established that "Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Sentilles v. Inter–Caribbean Shipping Corp.*, 361 U.S. 107, 110, 80 S.Ct. 173, 175, 4 L.Ed.2d 142 (1959)(internal citations omitted). This is especially so "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses, [then], it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir.1992).

In the instant case, the defendant has failed to carry the burden of showing that the verdict is "so strongly against the weight of the evidence that [it] may be characterized as a seriously erroneous result." *Hygh v. Jacobs*, 961 F.2d 359, 365 (2d Cir.1992); *see also Piesco v. Koch*, 12 F.3d 332, 345 (2d Cir.1993).

The issue for the jury was, as discussed above, whether the police officers had proba-

ble cause to arrest the plaintiffs and whether the three hour detention was unreasonable in light of the dearth of inculpatory evidence. The initial officer on the scene, when questioned as to the basis for probable cause, indicated that the Sergeant made the decision to arrest the plaintiffs, yet, the County never called the Sergeant as a witness. Furthermore, the County never elicited testimony as to the specific reasons why the plaintiffs were detained for three hours or the investigatory measures taken which eventually resulted in their release. Accordingly, the outcome of this case was predicated on the jury's determination of the witnesses' credibility and their analysis of the sufficiency of the County's evidence. Because such determinations are particularly within the province of the jury, and for the reasons discussed *supra*, denying the defendant's motion for judgment as a matter of law, the finding by the jury that there was not reasonable cause for the plaintiffs' arrests was not "seriously erroneous" so as to require it to be set aside, but was, within the bounds of reason. The verdict was supported by competent evidence and reasonable inferences, and thus, it is of no moment how the Court would have decided the issue in the first instance.

## A. IMPROPER SUMMATION

The defendant asserts that during summation, plaintiffs' counsel alleged racial bias and prejudice on the part of the Nassau County Police Officers, which bias was unsupported by the evidence or testimony, and as such created undue prejudice and passion sufficient to warrant a new trial.

It is uncontested that remarks in summation, which were made by counsel for both sides, unfortunately imputed a racial overtone to the trial. However, a paramount issue in this case was the police officers' identification of the plaintiffs and their resemblance to the suspects depicted in the wanted poster. In light of the discrepancies in height and weight between the plaintiffs and the accounts in the wanted poster, and the fact that the plaintiffs were the only black men in the store at the time of the incident, the inference that the police detained the plaintiffs predominately on account of their race is not

a wholly unreasonable extension of the testimony. Additionally, it goes to the credibility of the witnesses, an area properly addressed in summation. There were inflammatory comments, including, "I submit to you that that defense is borne out of the same poison seed that gave birth to this entire pathetic episode, the poison seed of bigotry," Tr. 412, as plaintiffs' counsel presaged defendant's physical resemblance defense. In response, the defendant's counsel initiated his summation with the comment, "I did not anticipate that Mr. Lanni had gone to the Johnny Cochran School of Law. I did not anticipate that he would be playing this race card as if this was the OJ case." Tr. 428.

Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial. Not every improper or poorly supported remark made in summation irreparably taints the proceedings. *Pappas v. Middle Earth Condominium Ass'n*, 963 F.2d 534, 540 (2d Cir.1992). Only if counsel's conduct created undue prejudice or passion, which played upon the sympathy of the jury, should a new trial be granted. *See Matthews v. CTI Container Transport Int'l Inc.*, 871 F.2d 270, 278 (2d Cir.1989); *Smith v. National R.R. Passenger Corp.*, 856 F.2d 467, 470 (2d Cir.1988).

The jury charge specified that the closing arguments of counsel are not evidence and included the following instruction:

"The Police Officers' underlying motivation in arresting Plaintiffs is not a consideration or a factor, in determining whether the defendant's Police Officers had reasonable cause to place Plaintiffs under arrest. In other words, good or bad faith, malice or the lack thereof, on the part of defendant's Police Officers are immaterial in your determination as to whether there was reasonable cause or not."

The charge sufficiently focused the jury on the narrow issue before them, beyond that, the Court did not find it necessary to comment upon the propriety of the injection of race into the case.

Because, as the Court believes, counsels' comments did not play upon the sympathy of the jury by creating undue prejudice or pas-

sion, the proceedings were not irreparably tainted and the summation did not cause the jury to reach a "seriously erroneous result" or a verdict that was "a miscarriage of justice." *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988).

## B. VERDICT WAS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE

■ Finally, the defendant avers that the verdict was not supported by the weight of the evidence. As discussed *supra*, the Court concludes that based on the evidence presented, the jury's finding that the defendant did not establish probable cause for the arrest and detention of the plaintiffs was not a seriously erroneous result. To prove the verdict was against the weight of the evidence requires the same showing as a motion for a new trial, that is that the jury reached "a seriously erroneous result" or that the verdict is a "miscarriage of justice." *See Sorlucco*, 971 F.2d at 875.

■ However, as discussed *infra*, the Court finds that the damages awarded are excessive, and therefore, the Court is faced with three options. The Court can order a new trial on all issues or order a new trial solely on the issue of damages, or, offer the plaintiffs the choice of a remittitur or a new trial on the issue of damages. This determination assesses whether the improper jury action affected both the liability and damages issues, and if so, a new trial as to both issues must be ordered.

Because the Court concludes that the defendant failed to establish at trial the existence of probable cause as a matter of law, the motion for a new trial will be granted, solely on the issue of damages, unless the plaintiffs accept a remittitur.

For a historical and thorough analysis of a trial court's authority to grant a new trial when a jury returns a verdict with excessive damages, albeit in the context of punitive damages, see *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).

## III. REMITTITUR

■ Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial. *See, e.g., Tingley Sys., Inc. v. Norse Sys., Inc.*, 49 F.3d 93, 96 (2d Cir.1995); *Phelan v. Local 305 of the United Ass'n of Journeymen and Apprentices of the Plumbing & Pipefitting Indus.*, 973 F.2d 1050, 1064 (2d Cir.1992); *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 49 (2d Cir.1984); 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2815 (1995).

■ The Seventh Amendment bars a court from unilaterally reducing a jury award, and accordingly, "the plaintiff must be given the option of a new trial on the issue of the damages found to be excessive." *Scala v. Moore McCormack Lines*, 985 F.2d 680, 684 (2d Cir.1993).

■ "Remittitur is appropriate to reduce verdicts only in cases in which a properly instructed jury hearing properly admitted evidence nevertheless makes an excessive award." *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1027 (2d Cir.1991)(internal citations omitted).

## A. PROPER MEASURE OF DAMAGES

■ Under New York law, damages for false arrest are to compensate for injuries from the beginning of custody to arraignment, and damages for malicious prosecution are to compensate for injuries after arraignment. *See Hygh*, 961 F.2d at 366 (2d Cir. 1992); *Dabbs v. State*, 59 N.Y.2d 213, 218, 464 N.Y.S.2d 428, 430, 451 N.E.2d 186 (1983).

The jury was only presented with the New York State law claim for false arrest. After deliberating for approximately one hour, the jury returned its verdict. The jury found that there was not reasonable cause for the arrest of the plaintiffs and awarded each plaintiff $160,000 for the compensatory damages they believed were sustained as a direct consequence of the defendant's Police Officers' conduct.

■ The Court in *Gasperini* decided the standard a federal court uses to measure the

alleged excessiveness of a jury's verdict in an action for damages based on state law, and in particular when applying New York law. 116 S.Ct. at 2217. New York codified a standard for judicial review of the size of jury awards in CPLR § 5501(c) which provides in relevant part:

> In reviewing a money judgment ... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

N.Y. Civ. Prac. Law and Rules (CPLR) § 5501(c)(McKinney 1995). This measure was taken, in large part, to install a standard inviting more careful appellate scrutiny than the "shocks the conscience" standard previously in place. *Gasperini,* 116 S.Ct. at 2217–18; *see also Consorti v. Armstrong World Indus., Inc.,* 72 F.3d 1003, 1013 (2d Cir.1995)("Material deviation from reasonableness is less than that deviation required to find an award so excessive as to 'shock the conscience.' ").

■ This standard requires a court to determine a reasonable range and to take corrective action when the particular jury award deviates materially from that range. Although the statute specifies its application in appellate review, it equally instructs trial judges. *See Gasperini,* 116 S.Ct. at 2218 (internal citations omitted).

■ Courts must determine an amount to fairly recompense plaintiffs' injuries, while also deciding a sum beyond which would be excessive. "The law does not permit a jury to abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.... Rather, the award must be fair and reasonable, and the injury sustained and the amount awarded rationally related. This remains true even where intangible damages ... cannot be determined with exactitude." *Taylor v. National R.R. Passenger Corp.,* 868 F.Supp.

479, 484 (E.D.N.Y.1994)(internal quotations omitted). The Court is mindful of the ancient aphorism, be just before being generous.

■ The proper standard to utilize in computing a remittitur was established in *Earl v. Bouchard Transp. Co., Inc.,* 917 F.2d 1320 (2d Cir.1990). The court reviewed the three rules district courts had adopted: (1) the most intrusive standard reduced the verdict to the lowest amount that could reasonably be found by the jury; (2) the intermediate standard reduced the verdict to what the trial court believes a properly functioning jury, acting free of suggestions by counsel, would have awarded; and (3) the least intrusive standard reduced the verdict only to the maximum that would be upheld by the trial court as not excessive. *Id.* at 1328–29. The court adopted the least intrusive standard, finding it to be the most justifiable and practicable system. *Id.* at 1330. Accordingly, the Court will implement the least intrusive standard.

■ In determining whether an award deviates materially from what would be reasonable compensation, the Court must look to awards approved in similar cases. As New York provides the substantive law in this case, we look for guidance to the New York State Courts' treatment of jury awards for false arrest arising under comparable circumstances. *See Gasperini,* 116 S.Ct. at 2219–20; *Consorti,* 72 F.3d at 1012; *Martell v. Boardwalk Enterprises, Inc.,* 748 F.2d 740, 750 (2d Cir.1984).

At the outset, it is important to bear in mind that no two cases have identical claims and facts. A review of numerous cases instructs the observation that certain distinctions can drastically alter and accrete the award. Specifically, the existence of: (1) physical injury suffered during the false arrest; (2) numerous claims and the ratcheting up and duplication that results; (3) constitutional claims and the implication of a grave injustice; (4) punitive damages and a heightened recovery on all counts. Therefore, the

Court will give more credence to truly equivalent cases, and the awards involving the aforementioned distinctions are included as much to highlight the distinction as to guide the decision.

## B. RELEVANT FACTORS

■ Numerous factors, when applicable, should be taken into consideration when determining reasonable compensation for a false arrest claim. These factors include (1) the length and condition of pre-arraignment detention; (2) the severity of injuries, if any, suffered at the hands of the police; (3) the egregiousness of the arrest; (4) the exculpatory information available to the police; (5) the treatment by the police including the use, if any, of force or derogatory language or slurs; (6) whether formal charges were brought, and the measures taken and costs incurred to defend; (7) the extent of procedural indignities suffered including being photographed, handcuffed, placed in a cell, placed in a line-up, fingerprinted, strip searched, etc.; (8) the amount of earnings, if any, that were lost; (9) the humiliation suffered; and (10) the injury to one's reputation.

■ In the instant action, the plaintiffs were detained for no more than three hours. They did not suffer any physical injury, were properly treated by the police, and no formal charges were brought. A pat down frisk was performed and they were handcuffed throughout the detention. Although they were each photographed, neither plaintiff was fingerprinted. Each plaintiff was in possession of photo identification confirming his identity, including his profession, age, weight, height and residence, and Mr Weston's vehicle provided an additional source of exculpating evidence. However, as discussed *supra*, the identification cards alone were not determinative, as the identity of the suspects was not known to the police and the physical descriptions were estimates. Neither plaintiff presented substantive evidence of loss of earnings and although Mr. Peterson subsequently visited a physician, the focus of the treatment was for a pre-existing illness.

Each plaintiff testified to the humiliation and to the fear suffered at the time of the incident, and subsequently. However, prevailing authority requires an objective showing of the victim's reputation before the false arrest as compared with its damaged condition afterwards. No such objective testimony was provided, the plaintiffs expressed fear of being recognized as someone previously arrested, but had not suffered the experience. *See*, *Loeb v. Teitelbaum*, 77 A.D.2d 92, 104–105, 432 N.Y.S.2d 487, *amended*, 80 A.D.2d 838, 439 N.Y.S.2d 300.

With these factors and facts in mind, the Court will consider the treatment other courts have given similar factual settings, and the verdicts awarded for false arrest.

In *Mason v. City of New York*, 949 F.Supp. 1068 (S.D.N.Y.1996), the plaintiff was wrongly incarcerated at the airport for roughly two hours by Port Authority officers. The jury returned a verdict of $100,000 under both federal and state false arrest claims. The court held that the "magnitude of this award does not comport with precedent, even when previous decisions are adjusted for inflation," and offered the plaintiff a remittitur of all but $10,000 of the $100,000 awarded. *Id.* at 1076.

In *Hygh v. Jacobs*, 961 F.2d 359 (2d Cir. 1992), the Second Circuit held that a $65,000 award for false arrest was "inconsistent with substantial justice." *Id.* at 367. Approximately three and one-half hours passed between the time of the plaintiff's arrest and his arraignment, during which time he was transported, booked, taken to a local hospital for treatment and arraigned, all the while handcuffed and prevented from placing any telephone calls. *Id.* at 366. As there was improperly admitted evidence, the court could not establish an amount to be remitted, but could only vacate the judgment and remand for a new trial on this claim. *Id.*

*Buffington v. City of New York*, 1996 WL 746150 (N.Y.Sup.Ct.1996), *Jokinsky v. City of New York*, 1996 WL 746358 (N.Y.Sup.Ct. 1996) and *Mick v. City of New York*, 1996 WL 747126 (N.Y.Sup.Ct.1996), are three

companion cases stemming from an incident involving their respective arrests. The sister, her adult son and her brother, were meeting at the siblings' mother's home for dinner when the sister's son was pulled over by police for a traffic violation, just as he reached the residence in question. An argument ensued, and the police ultimately entered the residence and arrested the son, his mother, and her brother. The brother, a disabled man, was assaulted by the police and suffered a fractured nose. All charges were dismissed and the jury awarded him $60,186 in light of the injuries suffered. The son was charged with disorderly conduct and was released after three hours in custody and awarded $750. The mother was arrested, the charges were dropped, and the jury awarded her $2724. As can be readily inferred, physical injury dictates larger awards, as in *Donaldson v. City of Mt. Vernon*, 1996 WL 641926 (N.Y.Sup.Ct.1996), in which the plaintiff was getting out of his vehicle to purchase coffee when the police held guns to his head and demanded identification. After he told them his name and address but that he had left his wallet at home, he reached down to pick up his keys. In response, the police placed him in a choke hold, kneed him in his back and arrested him. The plaintiff suffered cervical injury and the jury returned a verdict for the plaintiff totaling $97,500, which the court reduced to $55,000.

As with physical injury sustained, when the actions taken by the police constitute particularly egregious wrongs, the verdicts escalate. *See Coleman v. City of New York*, 1990 WL 461940 (N.Y.Sup.Ct.1990)(A "Good Samaritan" Male Black passerby came upon a Caucasian female sprawled on the hood of a parked car with two Caucasian males standing alongside her, outside of a disco. Believing she was being molested, he called 911 and returned to the scene to intervene on her behalf. A struggle ensued and he was injured. When the police arrived the assailants told the police that he was molesting the women. He was arrested on rape charges, even though he informed the police that he initially called 911 to report the incident, and he was kept in a prison ward hospital for four days before being released. No formal charges were ever filed against him. The jury awarded $165,000 as payment for four days of lost freedom and humiliation); *Navarez v. City of New York*, 1988 WL 373269 (N.Y.Sup.Ct.1988)(The plaintiff was present when a riot broke out and was arrested and subsequently released. He went to the precinct to discover the name of the arresting officer and was arrested again. The jury awarded a $30,000 total verdict for the combined false arrests); *Malte v. State*, 125 A.D.2d 958, 510 N.Y.S.2d 353 (4th Dep't 1986), *appeal denied*, 69 N.Y.2d 607, 514 N.Y.S.2d 1024, 507 N.E.2d 320 (1987)(The plaintiff, a school teacher, was falsely arrested in front of his students and peers. The teacher was strip searched, incarcerated for ten hours and was represented as a child beater by the police on television. The court reduced a $125,000 verdict for false arrest to $35,000); *Orndorff v. De Nooyer Chevrolet, Inc.*, 117 A.D.2d 365, 503 N.Y.S.2d 444 (3d Dep't 1986)(affirming an award of $50,000 for false arrest where the plaintiff, a major in the Air Force Reserves and a respected corporate employee, was handcuffed, strip searched, fingerprinted, photographed and held in custody for twelve hours all the while wrongly ridiculed in the newspaper for stealing a car).

When the damages are limited to the time detained, as in the case *sub judice*, the awards are demonstrably less. *See Holdsclaw v. City of New York and the Port Authority of New York and New Jersey*, 1993 WL 247041 (N.Y.Sup.Ct.1993)(The plaintiff was falsely arrested by Port Authority Police for trespassing after he refused to show his bus ticket, and then refused fingerprinting after not being allowed to read the fingerprint card. He was held in jail for one and one-half days and the jury returned a verdict in the amount of $10,000); *Peponakis v. City of New York*, 1992 WL 677670 (N.Y.Sup.Ct.1992)(The plaintiff received a jury award of $50,529 for emotional distress for being falsely arrested and held in an

unsanitary jail for one night without food or water); *Kiryako v. State of New York*, 1992 WL 552784 (N.Y. Ct. Claims 1992) (plaintiff was falsely arrested by an abusive off duty state trooper without justification and was held at the police barracks for an unnecessary amount of time and received an award of $3250); *Clark, Pro Ami v. State of New York*, 1991 WL 529136 (N.Y. Ct. Claims 1991)(black youth arrested in arcade store by state troopers because he fit the description of a shoplifter, received a $6000 award); *Temple v. State of New York*, 1993 WL 520449 (N.Y. Ct. Claims 1991) (plaintiff was wrongly arrested and detained by a state trooper at the request of a civilian and was not informed of the charges against him, received a $750 award); *Portis v. City of Buffalo*, 1990 WL 464228 (N.Y.Sup.Ct. 1990)(The plaintiff, a police officer, was injured when police entered her home to arrest her for reckless endangerment, for which she was later acquitted. She received a total verdict of $15,000, including $5,000 for false arrest and $10,000 for malicious prosecution based upon post-arraignment detention); *Velez v. United States*, 693 F.Supp. 51 (S.D.N.Y.1988)(plaintiff received $25,000 for two days of false imprisonment after a lawful arrest); *Dabbs v. State*, 105 A.D.2d 897, 482 N.Y.S.2d 62 (3rd Dep't 1984)(Court of Claims entered a judgment of $15,000 for false arrest and State appealed. The award was upheld as not excessive in light of the Court's finding that following publication of his arrest for rape, the plaintiff was unable to obtain employment as a security guard for approximately 110 weeks and had previously earned $135 per week, and had suffered severe humiliation and underwent several hours of prearraignment incarceration); *Hallenbeck v. City of Albany*, 99 A.D.2d 639, 472 N.Y.S.2d 187 (3rd Dep't 1984)(The plaintiff was wrongly arrested for traffic infractions and was handcuffed and detained for approximately three hours before being arraigned. A jury returned a verdict of $25,000 in compensation for the false arrest. Finding that the plaintiff was only detained for three hours and did not incur substantial physical or mental suffering, the court modified the judgment to $10,000); *Feldman v. Town of Bethel*, 106 A.D.2d 695, 484 N.Y.S.2d 147 (3d Dep't 1984)(Plaintiff, a newspaper editor attempted to audio tape record a town board meeting after being informed that it would not be allowed. He was arrested at the meeting, charged with disorderly conduct and was eventually tried and acquitted. He was awarded a verdict of $35,000 in compensatory damages for false arrest and malicious prosecution and $65,000 in punitive damages. The appellate court reduced the compensatory damage award to $15,000 and the punitive award to $1,000); *Kelly v. Kane*, 98 A.D.2d 861, 470 N.Y.S.2d 816 (3d Dep't 1983)(Plaintiff was arrested after being wrestled to the ground by the police, painfully handcuffed and taken to the precinct where he was fingerprinted and booked. After being released one and one-quarter hours later he was treated at the hospital for bruises. The award of $5,000 for false arrest was affirmed); *Woodard v. City of Albany*, 81 A.D.2d 947, 439 N.Y.S.2d 701 (3d Dep't 1981)(The plaintiff was wrongfully arrested to coverup and conceal the misconduct of an off duty police officer who had assaulted the plaintiff in a tavern. The jury returned a verdict of $16,000 for false arrest which the appellate court found to be excessive and reduced to $7,500 as the plaintiff had only spent five hours in jail and did not incur any substantial physical or mental injury).

The Court is mindful that the plaintiffs did absolutely nothing wrong and has sympathy for their suffering as a result of the arrests, nonetheless, the jury's award of $160,000 for each plaintiff deviates materially from what would be reasonable compensation and is grossly in excess of the amount which the evidence reasonably can support. The Court, having fully reviewed the trial transcript and the treatment of jury awards for false arrest arising under similar circumstances, and after taking into account the increase in the cost of living between the date of the cases being compared and the date of the jury verdict in the instant case, holds that an award of $15,000 for Charles Peterson and an award of $15,000 for Leon-

ard Weston is consistent with the maximum reasonable verdict under the circumstances.

Therefore unless the plaintiffs' individually file, within twenty days after the entry of this Order, a remittitur accepting judgment against defendant Nassau County in the amount of $15,000, the motion for a new trial will be granted, but limited to a determination of damages as defendant's liability has already been established.

## CONCLUSION

Defendant's motion for judgment as a matter of law is denied in its entirety. Defendant's motion for a new trial as to the jury's finding that the defendant's police officers did not have reasonable cause to arrest the plaintiffs is denied. The judgment is modified by reversing so much thereof as awarded each plaintiff, Leonard Weston and Charles Peterson, $160,000 compensatory damages and a new trial ordered only with respect to the issue of damages unless, within twenty days after the service of a copy of the Order entered herein, plaintiff Leonard Weston and/or plaintiff Charles Peterson, shall stipulate to reduce the amount of the verdict to $15,000 compensatory damages, each, in which event, the judgment, as so reduced, is affirmed, without costs.

SO ORDERED.