**Thomas JOCKS Plaintiff,**

v.

**Augusto TAVERNIER, Michael A. Oggeri, New York City Police Department, City of New York, Nassau County Police Department and the County of Nassau, Defendants.**

No. 96–CV–3595(TCP).

United States District Court, E.D. New York.

May 17, 2000.

---

Richard W. Young, Babylon, NY, Francis P. Murphy, Sayville, NY, for Thomas Jocks.

Marshall D. Trager, Trager, Cronin & Byczek, LLP, Lake Success, NY, Rocco G. Avallone, Trager, Cronin & Byczek, LLP, Lake Success, NY, Joseph P. Baumgartner, Trager, Cronin & Byczek, LLP, Lake Success, NY, for Augusto Tavernier.

Lois Weinstein, Owen B. Walsh, Mineola, NY, for Michael A. Oggeri.

Lois Weinstein, Mineola, NY, for Nassau County Police Dept.

Lois Weinstein, Mineola, NY, Charles H. Horn, Friedman & Harfenist, Lake Success, NY, for County of Nassau.

Jennifer E. Liddy, Office of Corp. Counsel, New York, NY, Bryan D. Glass, Corp. Counsel of City of New York, Law Dept., New York, NY, for New York City Police Dept., City of New York.

### MEMORANDUM AND ORDER

PLATT, District Judge.

Prior to all of the present motions before this Court, there were not one but two jury trials, both resulting in verdicts for the plaintiff herein Thomas Jocks. The first was a criminal case, in October of 1995, against Jocks brought by Nassau County for an alleged assault on the defendant Police Officer Augusto Tavernier herein and an alleged criminal possession of a weapon based on the latter's complaint and testimony, and the second was the case at bar, in February and March of 2000, brought by the plaintiff Jocks for violation of his civil rights and constitutional rights by reason of the false arrest and the malicious prosecution of him. In both cases, the key question was whether the jury believed the testimony of plaintiff or defendant Tavernier on a telephone incident (see *infra* pages 308–09) which formed the basis of the two verdicts.

In addition, at the heart of the City's motion to recuse was this Court's sanctioning of the City for the conduct of the New York City Police Department, of the witness/Police Officer Captain Morgan and other employees of that Department and of the Corporation Counsel's Office for failure to comply with two subpoenas served on the New York City Police Department. These had been addressed to Captain Morgan and served on his office on the Friday afternoon before the commencement of trial. Captain Morgan worked in his office until late that evening. All of the foregoing City employees refused to take responsibility for Captain Morgan's departure on Sunday[1] for Las Vegas and for his failure to appear on the opening of the trial. The Corporation Counsel Office was aware of the fact that the plaintiff and Nassau County had listed him as one of their witnesses in the pretrial order for the first three days of the trial. During those first three days, the Corporation Counsel's Office attempted to disclaim any knowledge of his whereabouts or any responsibility for his failure to appear. It was learned, however, as indicated above, that Captain Morgan had left for Las Vegas on the Sunday night (or Monday morning) before the trial commenced. Finally, on Wednesday morning, this Court ordered the Corporation Counsel to produce Captain Morgan as the last witness for the plaintiff's case on Thursday morning. Even though the Corporation Counsel had knowledge that the entire day would be lost for the jury trial if he was not produced at that time, he did not appear and the Corporation Counsel still disclaimed any responsibility for his non-appearance. As a consequence, the Court sanctioned the City for all of the costs and expenses caused thereby. By any measure this was a mild punishment imposed only on the corporate defendant and not on its individuals who perpetrated the contempt on the court and the jury.

### POST TRIAL MOTIONS

Now subsequent to these trials the following motions are before this Court for decision:

---

1. Sunday is the date most favorable to the City. However, the record indicates that Captain Morgan did not actually leave for Las Vegas until Monday, the first day of trial. Tr. 355–356.

Plaintiff Thomas Jocks makes a motion for sanctions against Defendants City of New York and the New York City Police Department ("City"). This motion will be addressed together with the City's cross-motion for sanctions and the City's motion for recusal of this Court from further proceedings in this action.

In addition, the City makes a motion for reconsideration of this Court's assertion of jurisdiction over defendant Tavernier's indemnification cross-claim against the City, and defendant Tavernier makes a motion for indemnification on this cross-claim. The City and Tavernier further make motions for the following: (1) vacatur of the judgment against defendant Tavernier as a matter of law pursuant to Federal Rule of Civil Procedure ("FRCP") Rule 50(b); (2) a motion for a new trial pursuant to FRCP Rule 59(a); and (3) remittitur of judgment against defendant Tavernier pursuant to FRCP Rule 59(e).

## BACKGROUND [2]

This is an action with remaining claims for civil rights violations pursuant to 42 U.S.C. § 1983, seeking redress for false arrest and malicious prosecution in violation of plaintiff's constitutional rights under the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States. To the extent relief is sought by plaintiff for false arrest, this relief lies only under violation of the Fourth Amendment pursuant to *Albright v. Oliver*, 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

On October 11, 1994, plaintiff Thomas Jocks was operating a tractor trailer heading east on the Long Island Expressway ("LIE") in Nassau County when his tractor trailer broke down just west of Round Swamp Road. Tr. 47. Plaintiff did his best to pull the truck off the highway. Tr. 47. However, some four feet of the back of the trailer was still protruding onto the highway. Tr. 47. Plaintiff removed the trailer from the front cab in order to try to get the cab further forward for safety reasons. Tr. 48. Plaintiff then placed emergency triangles before the truck to warn oncoming traffic of the hazard. Tr. 48–49. Realizing that the protruding truck constituted a very dangerous situation, plaintiff tried to wave down help from oncoming traffic with no avail. Tr. 49. Plaintiff saw that other trucks were coming over the hill and swerving out of the way to avoid hitting the protruding trailer. Tr. 49. Concerned about the danger his truck posed to drivers, plaintiff ran approximately three-quarters of a mile to a Mobil Gas Station to use the telephone to call for help. Tr. 50.

Defendant Tavernier was, and currently is, a New York City Police Officer. At the time at issue, Tavernier was in plain clothes, off-duty on his way home and in his car using a public telephone for a personal call. Tr. 224. As plaintiff saw Tavernier using the phone, plaintiff first went to the gas station convenience store and asked the clerk to use the phone. Tr. 53. Plaintiff told the clerk he had an emergency situation, that he had a tractor trailer broken down, and that he needed to call the police. Tr. 53. The clerk spoke little English and told him several times that he had no phone and to use the phone outside. Tr. 53. There was only one phone outside, the phone Tavernier was using. It did not appear that there were any other buildings or phones nearby. Tr. 55.

Plaintiff asked defendant Tavernier if he could use the telephone in order to call the police to tell them that his truck was broken down on the highway and that he needed emergency help. Tr. 54. Defendant Tavernier ignored plaintiff's first request, telling plaintiff to find another phone. Tr. 54–55. Plaintiff waited and then again told Tavernier that he had an emergency and would appreciate it if Tavernier let him use the phone or if Taverni-

---

2. For purposes of the motion to set aside the verdict as a matter of law and motion for

remittitur, we set forth the facts in the light most favorable to the plaintiff, as is proper.

er would dial the emergency (911) personnel for plaintiff. Tr. 55–56. Tavernier then swore at plaintiff and told plaintiff that he was not going to get to use the phone. Tr. 56. Plaintiff made a third request, explaining that the situation was desperate because somebody was going to hit the truck. Tr. 56–57. Again, Tavernier swore at plaintiff and refused to let plaintiff use the phone. Tr. 57.

Plaintiff, extremely upset that his truck might cause an accident and that Tavernier would not let him use the phone or call the police for him, hung up the telephone by depressing the on/off lever on the phonebox. Tr. 57. Defendant Tavernier threw the phone at plaintiff, pulled the car forward, got out of the car, Tr. 57–58, 129, and charged back at plaintiff shouting "if I can't use the phone—you can't use the phone." Tr. 58.

A struggle ensued in which plaintiff began dialing 911 while defendant Tavernier tried to hang the phone up by pushing plaintiff and swearing at him. Tr. 58. Plaintiff again tried to explain the emergency situation to Tavernier. Tr. 58. Tavernier's response was to state "why don't I blow your f—ing brains out," while revealing a gun. Tr. 58–59. At no time during this incident had Tavernier stated that he was a police officer. Plaintiff, then in imminent fear of serious injury, threw the phone in a backward fashion at Tavernier and ran toward the convenience store. Tr. 59. Tavernier was struck with the telephone which caused a minor injury to his lip. Tr. 139. At this point, Tavernier stated that he was a cop, chased after plaintiff, shoved the gun to the base of plaintiff's head, and told plaintiff he was under arrest. Tr. 59. Tavernier then held plaintiff at gunpoint while escorting him to the convenience store.

Officer Hartman of the Nassau Police arrested plaintiff based on Tavernier's complaint. Defendant Oggeri of the Nassau Police processed plaintiff's arrest. Plaintiff was charged with Felony Assault and Criminal Possession of a Weapon, i.e.,

the telephone handle, and held in custody until his arraignment. Plaintiff was arraigned and released on bail the next evening.

On October 12, 1994, Newsday, the major paper in the region, published an article on the front page of the Long Island Section stating that plaintiff had assaulted a man with a telephone. Tr. 79. Plaintiff was humiliated, as friends and co-workers saw and commented on the article; these people are no longer in contact with plaintiff. Tr. 79–80. Plaintiff was required to make 28 criminal court appearances due to this incident. Tr. 73. As a result, plaintiff claimed he lost his trucking job at TC Transports in December of 1994. Tr. 73–74. Plaintiff also claimed he lost sole custody of his then fourteen year old daughter. Tr. 86. Plaintiff experienced difficulty sleeping and driving at night. Tr. 80, 86, 87. After a nine day trial, the jury returned a verdict of "not guilty" on all charges against plaintiff. Tr. 85. Plaintiff incurred $20,000 in legal fees due to this criminal proceeding. Tr. 73.

Thereafter, on July 19, 1996, plaintiff commenced this action against defendants. On February 28, 2000, trial was commenced. On March 6, 2000, this Court granted a directed verdict in favor of defendants Michael A. Oggeri, the County of Nassau and the City of New York. On March 8, 2000, the jury returned with a verdict against the remaining defendant, Augusto Tavernier, as follows:

a. that plaintiff was arrested without probable cause in violation of his constitutional rights;

b. that plaintiff sustained damages caused by the unlawful arrest in the amount of $ 300,000;

c. that plaintiff was maliciously prosecuted without probable cause in violation of his constitutional rights; and

d. that plaintiff sustained damages as a result of the malicious prosecution in the amount of $322,000.

## I. MOTION TO RECUSE AND MOTIONS FOR SANCTIONS

### A. Motion to Recuse

■ This Court denies the City's motion to recuse for the well stated reasons in Richard Young's Affirmation, dated April 3, 2000. See ¶¶ 4–16. In brief, as to the Court's comments with regard to Corporation Counsel, in particular comments addressed to Patricia Miller, *none* were made in the presence of the jury. More importantly, these rebukes were necessary to maintain order and control over proceedings. A few of Ms. Miller's habits included repeatedly arguing matters which were previously ruled upon, refusing to allow other attorneys to speak, although they patiently waited for her to finish, and once other attorneys managed to gain the floor, Ms. Miller would continually interject and speak over the other attorneys.[3]

**3.** As plaintiff attorney Patrick Young stated:

Throughout this trial, Ms. Miller attempted to provoke the Court by trying to speak over the Court (T. 299, 510, 531, 536, 547, 553, 555), failing to stand up to voice objections (T. 1042–43) and repeatedly arguing with the Court regarding matters which were previously ruled upon. T. 529, 537, 538–539, 721–41, 761, 1029. It would seem that Corporations Counsel's trial strategy was to provoke the Court in such a manner that the Court was forced to bluntly order counsel to cease and desist, so that Corporation Counsel could later claim that the Court should recuse itself. . . .

Lastly and equally important, the plaintiff feels compelled to point out that Corporation Counsel's conduct was the direct cause for any comments the City of New York attempts to make an issue out of. This attorney, Patricia Miller, was without a doubt one of the most discourteous and obnoxious attorneys I have ever had the misfortune of trying a case against. The lack of respect for the Court that she demonstrated time and again was tantamount to disdain. Any comments made by other parties, attorneys, or the Court towards her were only made after her frequent and unrelenting colloquys [sic] during which Ms. Miller rambled. . . .

This attorney even went as far as telling the Court that it was wrong and would be "reversed" on appeal with an air of arrogance which I have never heard spoken to

As the Second Circuit has held, "the district judge, in conducting a criminal or civil trial, acts as more than a mere moderator or umpire. His function is to set the tone of the proceedings and exercise sufficient control to insure that the trial will be an orderly one in which the jury will have the evidence clearly presented." *Zinman v. Black & Decker,* 983 F.2d 431, 436 (2d Cir.1993). Any statements made by this Court to witnesses, were made to recalcitrant witnesses attempting to avoid asking the question at hand or were made to witnesses refusing to maintain order and respect for the law.[4]

### B. Motions for Sanctions

■ For the reasons stated in plaintiff's proposed Order and Memorandum Awarding Attorney's Fees, Jury Costs and Court

any judge, no less an Article III Judge. T. 638. . . .
Richard Young's Affirmation, dated April 3, 2000, ¶¶ 4, 16.

**4.** For example:

At no time in the case at bar did the Court challenge defendant or his counsel with regard to the evidence presented or testimony regarding this incident. Nor did the Court publish any remarks to the jury with regard to defense counsel's questions. While it is true that the Court was forced to admonish Det. Oggeri, the Court never challenged the veracity of the Detective's testimony. In addition, when Det. Oggeri was ordered by the Court to answer plaintiff's questions defendant shouted at the Court "Well, then he will have to rephrase his question." T. 401–02. At that time the Court corrected Det. Oggeri's behavior and was gracious not to hold the [sic] him in contempt.
Richard Young's Affirmation, dated April 3, 2000, ¶ 10.
Moreover, "The Court's purported mistreatment of Captain Morgan did not concern a matter of credibility or evidence. Rather, Captain Morgan attempted to deny any fault for leaving the Eastern District of New York for Las Vegas, Nevada, the day after a subpoena was delivered to his place of business. T. 571." Richard Young's Affirmation, dated April 3, 2000, ¶ 13. Captain Morgan also failed to acknowledge the gravity and weight a subpoena carried.

Costs as Sanctions and Richard Young's Affirmation, dated April 3, 2000, as well as the introduction to this Order, this Court grants plaintiff's motion for sanctions against the City and denies the City's cross-motion for sanctions against plaintiff's counsel.

Corporation Counsel Patricia Miller's failure to produce Captain Morgan, to put it mildly, did not enhance her standing with the Court. She appeared to be in violation of a Court order, continually disavowed any knowledge of or control over Captain Morgan, and persistently resisted any Court instructions to gain knowledge or control over this City employee. Ms. Miller was and is disingenuous at best when claiming ignorance as to even plaintiff's desire to call Morgan in light of the following: (1) Morgan was listed on the Pre–Trial Order as plaintiff's second trial witness; (2) Morgan was a critical witness as the commanding officer who took Tavernier's statement the night of the incident; (3) Mr. Brian Glass, Esq., also of Corporation Counsel, was personally appraised on February 15, 2000, by Mr. Young of his intent to call Captain Morgan during plaintiff's case in chief; (4) Mr. Young's February 16, 2000 letter to Corporation Counsel naming Morgan as a witness; and (5) the two outstanding subpoenas requiring Captain Morgan's appearance at trial starting February 28, 10:00 a.m., which was the first day of trial. Any ignorance Ms. Miller or the City may have suffered was due to their own avoidance of any information concerning or responsibility in producing Captain Morgan for trial.

Ms. Miller was personally appraised during trial on Tuesday, February 29, 2000, that Morgan was to be called as a witness. Corporation Counsel then determined that he was in Las Vegas, but did nothing at the time to secure Morgan's overdue presence at trial. The next morning, March 1, 2000, at 9:30 a.m., this Court then had to order Corporation Counsel to produce Captain Morgan the next morn-

ing, pursuant to the two outstanding subpoenas—he was not produced. The attorneys and jury were then dismissed, as this witness was the last witness in plaintiff's case in chief. A whole day of trial was lost and everyone incurred substantial costs and expenses as a result thereof. The case had to then be adjourned until Monday, March 6, 2000.

Ms. Miller should be grateful that the parties did not seek personal sanctions against her and that the Court only imposes mild sanctions against the City to pay for the attorneys' and jury's time, travel, and incidental expenses due to Captain Morgan's failure to appear. It should also be noted that this motion for sanctions against the City was joined in support by counsel for the respective co-defendants, County of Nassau and Michael Oggeri, by Charles Horn, Esq., and co-defendant, Augusto Tavernier, by Rocco Avallone, Esq. Using this contemptuous conduct and this sanction as a platform for a motion to recuse this Court, is the height of impudence. The motion to recuse is necessarily denied. The plaintiff's motion for sanctions against the City is granted, and the City's cross-motion for sanctions against plaintiff's counsel is denied. A subsequent order with the specific calculation of sanctions will follow.

## II MOTION FOR RECONSIDERATION OF THIS COURT'S JURISDICTION OVER THE INDEMNIFICATION CROSS–CLAIM

The City moves for reconsideration of this Court's original assertion of jurisdiction over the indemnification claim, maintaining that the only forum for this claim is an Article 78 proceeding in New York State court. The City's assertions appear disingenuous, and again brazen, as the City specifically stipulated that there was no dispute as to this Court's jurisdiction in the Joint Pre–Trial Order, dated March 1998. The Pre–Trial Order states the following: "The jurisdiction over the cross-claims asserted by defendant, Augusto

Tavernier against the City of New York, which are based upon State Law, exists by supplemental jurisdiction, pursuant to 28 U.S.C. Section 1367(a).... The jurisdiction of this Honorable Court is not disputed." p. 2. Even assuming that this is now some sort of collateral or subject matter jurisdiction question, and addressing the merits of the City's assertions, denial of the motion is still proper.

### A. State's Jurisdiction is Not Exclusive under § 50–k

■ New York General Municipal Law ("GML") § 50–k requires the City of New York to indemnify an employee in any proceeding which arises from any act or omission by the employee, while the employee was acting within the scope of his public employment and in the discharge of his duties.

■ The Corporation Counsel of the City of New York makes the initial determination as to whether the employee will be indemnified under § 50–k. *Harris v. Rivera*, 921 F.Supp. 1058, 1060 (S.D.N.Y. 1995) (*citing Williams v. City of New York*, 64 N.Y.2d 800, 801, 486 N.Y.S.2d 918, 476 N.E.2d 317 (1985)). This determination may be challenged under Article 78 of the New York Civil Practice Law and Rules, ("CPLR"). *See* CPLR § 7803(3). The City has ceaselessly argued that an Article 78 proceeding is the exclusive forum in which to litigate the indemnification claim and that this Court has no jurisdiction whatsoever. However, the City's position is unpersuasive. As Judge Scheindlin stated in *Harris v. Rivera:*

> GML § 50–k is silent with respect to the means by which a City employee may challenge a denial of indemnification. [ ] No rule of statutory construction allows the court to rewrite a statute to add limitations that are found neither in the plain language of the statute nor in any legislative history. A city employee may pursue a claim for indemnification by

bringing an action in any court that has jurisdiction to hear the claim.

921 F.Supp. at 1061.

### B. Supplemental Jurisdiction is Appropriate

■ It is within the Court's discretion to exercise supplemental jurisdiction over state claims where the state and federal claims derive from a common nucleus of operative facts. *Id.* "Judicial economy dictates trying the issues in the same court and to the same jury. Careful instructions to the jury will minimize any possible confusion." *Id.* at 1062. Here, the state and federal claims clearly arise from the same nucleus of facts—Jocks and Tavernier's incident with the phone.

Unlike the caselaw defendants cite, fairness and judicial economy mandate that this Court maintain jurisdiction over the indemnification issue so that all parties can establish their rights and liabilities in one action. The City participated in discovery, motion practice, and trial with all the other parties involved in this action. This Court is fully familiar with the facts and case issues, as it has dealt with this matter from complaint through trial. Judicial economy and fairness would not be served if this Court declined to maintain jurisdiction over the indemnification claim.

### C. Ripeness of the Indemnification Claim

■ Claims for indemnification do not generally ripen until a judgment in the underlying action is paid. However, courts have created a broad exception to this rule: where indemnification is asserted in a third-party action ... for the sake of fairness and judicial economy, the CPLR allows third-party actions to be commenced in certain circumstances before they are technically ripe, so that all parties may establish their rights and liabilities in one another.

*Nevares v. Morrissey*, 1998 WL 265119, *6 (S.D.N.Y.1998) (*citing Harris*, 921 F.Supp.

at 1062). This case easily falls into this exception for the aforementioned reasons.

*Frontier Ins. Co. v. State,* 87 N.Y.2d 864, 638 N.Y.S.2d 933, 662 N.E.2d 251 (1995) is easily distinguishable, as the case involved Officers Law § 17 and not GML § 50. *See Kelly v. City of New York,* 692 F.Supp. 303, 306 (S.D.N.Y.1988) ("there are substantial differences between section 17 of the Public Officers Law and section 50–k of the General Municipal Law, and these distinctions may require a different rule as to section 50–k."). Moreover, the question in *Frontier* was whether an Article 78 proceeding was appropriate under the circumstances, not whether an Article 78 proceeding was the only forum for addressing the indemnification claim.

This Court's jurisdiction over the indemnification claim is proper. Therefore, the City's motion for reconsideration on this issue, must be, and hereby is, denied.

## III. MOTION FOR INDEMNIFICATION

New York State General Municipal Law § 50–k states the following:

> The city shall indemnify and save harmless its employees in the amount of any judgment obtained against such employees in any state or federal court, or in the amount of any settlement of a claim approved by the corporation counsel and the comptroller, provided that the act or omission from which such judgment or settlement arose occurred while the employee was acting within the scope of his public employment and in the discharge of his duties...

N.Y. Gen. Mun. Law § 50–k (McKinney's 1999).

■ The question of whether an employee is entitled to indemnification depends on whether the employee was acting within the scope of his or her employment. This determination, made by Corporation Counsel, may be set aside by this Court if the determination was "arbitrary and capricious." *See Williams v. City of New York,* 64 N.Y.2d 800, 802, 486 N.Y.S.2d 918, 476 N.E.2d 317 (1985); *See also Kelly v. City of New York,* 692 F.Supp. 303, 308 (S.D.N.Y.1988).

■ Mr. Dan Connolly, Esq. was the Corporation Counsel attorney responsible for the decision not to indemnify Defendant Tavernier. Mr. Connolly testified that he learned about the verdict on Thursday morning, March 9, 2000. T. 1094. He further testified that he read the entire trial transcript except the last two days of trial and the deposition testimony of defendant Tavernier, as well as some police documents before Corporation Counsel's meeting on Thursday, March 9, 2000, at 3:00 p.m. T. 1104, 1100. This turned out to be an incorrect representation, as Mr. Connolly later admitted that he had only read 300 pages of the relevant testimony before he and his legal team met to make this decision. T. 1139. It also appears that Mr. Connolly had not read defendant Tavernier's disciplinary record, Tavernier's personnel file, the criminal trial transcripts or the motions or exhibits in this case. Even more alarming, Mr. Connolly failed even to question anyone from the City Police Department, including the police captain who investigated the matter first hand.

Corporation Counsel's determination gives literally every appearance of being arbitrary and capricious. However, since we may only set aside this decision as arbitrary and capricious if "it lacks a factual basis," this Court must perforce deny the indemnification cross-claim. *Behar v. City of New York,* 1999 WL 212685, *3 (S.D.N.Y.1999) (*citing Williams v. New York,* 64 N.Y.2d 800, 802, 486 N.Y.S.2d 918, 476 N.E.2d 317 (1985)). There are several bases in fact upon which Corporation Counsel could have found Tavernier was not acting within the scope of his duty, including that: (1) Tavernier obstructed plaintiff in his attempt to call for emergency help when Tavernier's duty was to aid citizens; (2) Tavernier threatened plaintiff with death and with a gun; and (3) Taver-

nier signed a false felony complaint against plaintiff.

Therefore, we are compelled to deny Defendant Tavernier's motion for indemnification.

## IV. MOTION TO VACATE THE JUDGMENT AS A MATTER OF LAW PURSUANT TO SECTION 50(B)

### A. Standard of Review

█ Judgment as a matter of law should not be granted unless:

> (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Williams v. County of Westchester,* 171 F.3d 98, 101 (2d Cir.1999) (*quoting Cruz v. Local Union No. 3 of the Int'l Brotherhood of Electrical Workers,* 34 F.3d 1148, 1154 (2d Cir.1994)).

The Court must view the evidence in the light most favorable to the opposing party. *Piesco v. Koch,* 12 F.3d 332, 343 (2d Cir. 1993). The Court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury. *Williams,* 171 F.3d at 101.

### B. Analysis

#### 1. Color of Law

As a matter of law, it may not be said that Tavernier did not act under color of state law. In *Stengel v. Belcher,* 522 F.2d 438 (6th Cir.1975), an off-duty policeman and out of uniform Belcher, involved himself in an altercation at a bar. Belcher was equipped with a can of mace and a 32

caliber revolver. At no point during the altercation did Belcher state that he was a police officer. Belcher ended up shooting three men in the altercation. Belcher contended that there was insufficient evidence to show that he was engaged in anything but private social activity. However, there was evidence that Belcher, although he overstepped the bounds, intervened in the dispute pursuant to department regulations. *Id.* at 441.

The Court cited to several reasons why the color of law question properly went to the jury, including: (1) the mace was issued to him by the police department and the pistol was required to be carried by department regulation; (2) the chief of police testified that a police officer was required to take action in any type of police or criminal activity 24 hours a day; (3) a letter from the Director of Public Safety concluded that Belcher acted within the "line of duty"; and (4) Belcher received workmen's compensation on the ground that he acted in the "line of duty."

█ Similarly, the color of law question properly went to the jury in the instant case for several reasons, including: (1) Tavernier was determined fit for duty, armed, and discharging his duties as a police officer at the time of the arrest, Tr. 698; (2) Captain Morgan testified that an officer is on duty 24 hours a day, Tr. 602–603; (3) Tavernier was found to be acting in the "line of duty," Tr. 695; (4) Tavernier received workmen's compensation to cover his injuries for acting in the "line of duty," Tr. 600. Thus, "[o]ut of an abundance of caution, the District Court submitted this factual issue to the jury for its determination." *Id.* at 441. Defendants have cited to no cases on point to the contrary.

#### 2. False Arrest Claim

█ Although plaintiff's false arrest claim is for violation of Fourth Amendment rights, (using a Section 1983 federal civil rights claim as the vehicle), state law applies with regard to the elements of the

claim. *See Murphy v. Lynn*, 118 F.3d 938 (2d Cir.1997). To sustain a false arrest claim, plaintiff must demonstrate: (1) that defendant intended to confine plaintiff; (2) that plaintiff was conscious of the confinement and did not consent to it; and (3) that the confinement was not otherwise privileged. *Peterson*, 995 F.Supp. at 313 (*citing Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir.1996)). Probable cause defeats any such claim. *Townes v. City of New York*, 176 F.3d 138, 149 (2d Cir.1999). "Even without a technical formal arrest, a suspect's detention may in fact be the equivalent of an arrest...." *Peterson v. County of Nassau*, 995 F.Supp. 305, 314 (E.D.N.Y.1998) (*citing People v. Hicks*, 68 N.Y.2d 234, 239, 508 N.Y.S.2d 163, 500 N.E.2d 861 (1986)). Defendant Tavernier pointed his gun at Jocks, stated that he was a cop and that plaintiff was under arrest. Tavernier then detained plaintiff at gunpoint in the convenience store until Nassau Police arrived. A jury could easily find that Tavernier intended to confine Jocks, that Jocks was aware of the confinement, and that Jocks did not consent to the confinement.

A jury could also determine there was no probable cause for Tavernier initially to confine and arrest plaintiff. Tavernier created, through his own improper action and false statements, any alleged probable cause for arresting plaintiff. *See Hart v. City of New York*, 186 A.D.2d 398, 588 N.Y.S.2d 1012 (1st Dep't 1992) (holding false arrest and malicious prosecution claims were properly submitted to jury, as real dispute existed as to whether the arresting officer had knowingly provided false testimony to the Grand Jury resulting in plaintiff's indictment and incarceration). Tavernier caused the whole incident by obstructing plaintiff from calling the police, by threatening to kill plaintiff, and by threatening plaintiff with the exploitation of his gun. These events happened *before* the plaintiff, in fear for his life, threw the phone backwards at defendant to get away from him. A jury could reasonably find that since Tavernier was a

direct participant (and instigator), knowing the actual sequence of events, Tavernier had no probable cause for detaining or arresting plaintiff.

**3. Malicious Prosecution**

 Malicious prosecution requires a showing of the following:

(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff;

(2) the termination of the proceeding in favor of the accused;

(3) the absence of probable cause for the criminal proceeding; and

(4) malice.

*Maxwell v. City of New York*, 156 A.D.2d 28, 33, 554 N.Y.S.2d 502 (1st Dep't 1990) (*citing Broughton v. State*, 37 N.Y.2d 451, 457, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)).

 The evidence supports satisfaction of all four elements. First, the proceeding was commenced by complaining witness defendant Tavernier, who signed the felony complaint against plaintiff. Tavernier's complaint and signature are not disputed. *See* PTO, Exh. D. ¶ 18. Thus, there is no dispute as to the first element, contrary to defendant's urging. *See Fincher v. County of Westchester*, 979 F.Supp. 989, 999 (S.D.N.Y.1997) (holding that "[t]here is no dispute as to the first element. Whether the supporting deposition was forged or not, Utsch filed and signed the felony complaint, Greenan witnessed Utsch's signature, and Mione witnessed the supporting affidavit, thereby commencing the criminal proceeding against Fincher."). Second, it is undisputed that the proceeding terminated in plaintiff's favor.

Third, as a matter of law, it cannot be said that there was no probable cause, as evidence exists that Tavernier created a false version of events upon which he initially arrested plaintiff and stated in a complaint, and upon which the entire prosecution and trial was based. *See Maxwell*

*v. City of New York*, 156 A.D.2d 28, 32, 554 N.Y.S.2d 502 (1st Dep't 1990) (holding that since detective submitted two separate perjurious statements and based on this fraudulent felony complaint the plaintiff was detained and prosecuted, the court could not deem as a matter of law that there was no probable cause to prosecute and no malice demonstrated); *See also Hart*, 186 A.D.2d 398, 588 N.Y.S.2d 1012 (holding there was sufficient evidence to support the jury's finding that the arresting officer had knowingly provided false testimony to the Grand Jury resulting in plaintiff's indictment and incarceration; thus a new trial was not appropriate); *Accord Fincher*, 979 F.Supp. at 1000 (*citing Maxwell*, 156 A.D.2d at 34, 554 N.Y.S.2d 502 (denying summary judgment for defendant, holding probable cause may be overcome by evidence of bad faith such as fraud, perjury, or falsification, misrepresentation, or withholding of evidence)). Thus, a jury could reasonably find that no probable cause existed for arrest.

Fourth, for the same reasons that there cannot be said as a matter of law that there was no probable cause, as a matter of law it cannot be said that there was no malice. When there is evidence, as there is in this case, that defendants have "misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith . . . the presumption of probable cause has been overcome, and it can no longer be held as a matter of law that defendant prosecuted plaintiff with probable cause and without malice." *Maxwell*, 156 A.D.2d at 34, 554 N.Y.S.2d 502; *See also Hart*, 186 A.D.2d 398, 588 N.Y.S.2d 1012; *Accord Fincher*, 979 F.Supp. at 1000.

As the New York Court of Appeals has stated, "in practice, 'malice' as here conjoined with 'prosecution' often comes to mean conscious falsity." *Munoz v. City of New York*, 18 N.Y.2d 6, 9, 271 N.Y.S.2d 645, 218 N.E.2d 527 (1966). There is evidence that Tavernier signed a false complaint and testified against plaintiff falsely during the criminal trial. Thus, a jury could reasonably find that Tavernier acted with malice.

Defendant Tavernier's case citations are all distinguishable. None of defendants' case citations involve a defendant who concocts a false version of events upon which the defendant makes an arrest, files a complaint, and perpetuates at the criminal trial of the plaintiff. For the reasons stated above, Defendant City's and Defendant Tavernier's motion to set aside the verdict pursuant to Rule 50, must be, and hereby are, denied.

## V. MOTION TO GRANT A NEW TRIAL PURSUANT TO RULE 59(A)

### A. Standard of Review

In comparison to the standard for judgment as a matter of law, a trial judge hearing a motion for a new trial is free to weigh the evidence himself or herself and need not view it in the light most favorable to the verdict winner. *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir.1992). However, a court should refrain from setting aside the verdict and granting a new trial when "the resolution of the issues depended on assessment of the credibility of witnesses." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992). This Court should moreover only grant a new trial if it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice. *Song*, 957 F.2d at 1047.

### B. Analysis

The resolution of issues in this case are necessarily dependent on the assessment of credibility of witnesses. Plaintiff and defendant Jocks were the only two people to hear and see everything in the telephone incident. Thus, this Court should refrain from setting aside the jury's verdict.

Moreover, no seriously erroneous result or miscarriage of justice has occurred either. In this case, the defendants have

failed to carry the burden of showing that the verdict is "so strongly against the weight of the evidence" that it may be deemed "a seriously erroneous result." *Peterson*, 995 F.Supp. at 318 (citations omitted).

Defendants also make twenty-six allegations of error by this Court. For the reasons set forth in great detail in the Affirmation in Opposition to Defendant, Augusto Tavernier's Motion For Judgment as a Matter of Law, Remittitur, and a New Trial and Plaintiff's Cross Motion for Prejudgment Interest, dated March 26, 2000, these allegations are meritless. Notably, almost all of defendant's twenty-six allegations of Court error were not objected to at the time of trial and are cursory one or two sentence statements devoid of any explanation of how the alleged Court actions affected the verdict or constituted reversible error.

 In particular, and by way of example, defendants claim that the Court erred in excluding two civilian witnesses who "were not permitted to testify on behalf of Tavernier notwithstanding the fact that they were on the pre-trial witness list and appeared in court ready to testify on behalf of the defendant Tavernier." Rocco Avallone's Undated Attorney's Declaration In Support of Defendants' Motion For Judgment as a Matter of Law, Remittitur, and a New Trial, ("Avallone Aff."), p. 18, § b. This is the extent of the representation made by defendants on this subject. The mischaracterizations and omissions by defendants on this subject are wholly improper and, yet again, brazen.

Three statements were written up by the Nassau County police from eye witnesses who saw some of the incident but who did not see the initial events or hear any of the dialog. These witnesses were not produced at the start of trial. On March 1, 2000, attorneys for defendants Tavernier, Oggeri, and Nassau, stated that they wanted to call these witnesses but that they were not able to locate these witnesses, and thus wanted to read the

transcripts from the criminal proceeding into evidence. Plaintiff objected because he desired the opportunity to cross-examine these witnesses.

In an abundance of caution, this Court stated that before proceeding, a hearing would be held to determine what was done to locate these witnesses and whether they were actually able to be located. Tr. 344. Defendants' attorneys repeatedly represented to this Court that they had been using all possible resources, including private investigators and the Nassau County Police, to locate these witnesses and subpoena them, but they could not find any one of them. Tr. 353–54. In order to avoid the hearing, defendants and plaintiff stipulated to allow the police written statements of one eye witness, Adam Cronin, into evidence and allowed testimony as to the existence and consistency of the other two witness statements. *See* Tr. 364–66. The Court then specifically stated, without any objection from defendants, that the underlying assumption of the stipulation was that no party may further argue about the missing witnesses and that the stipulation could be read should the jury inquire about the witnesses. Tr. 436. On March 6, 2000, six days after commencement of trial, defendants' "unavailable" witnesses appeared at the courthouse to testify, pursuant to defendants' subpoena.

For defendants now to attempt to blame the Court for excluding two witnesses from testifying, when defendants were the parties who adamantly represented to the Court at the commencement of the trial that the three witnesses were not able to be found, voluntarily entered into a stipulation to avoid a hearing and to dispense with the matter by introducing one statement represented as consistent with the other two, and then wishing to call the witnesses who suddenly appeared six days after the commencement of a jury trial, is frivolous at best.

 Defendants separately allege that "[a]ll four (4) defendants were ordered to

share just three (3) peremptory challenges despite the fact that a conflict of interest existed between defendant Tavernier and co-defendant, City of New York." Avallone Aff., p. 20, § f. This is the extent of defendant's description of the alleged reversible error. First, pursuant to 28 U.S.C. § 1870, the Court has discretion to consider several defendants as a single party for the purposes of making challenges, which the Court did. Second, and more notably, defendants do not acknowledge that no party objected to this arrangement and defendants chose not to exercise their last peremptory challenge. In sum, defendants waived one peremptory challenge at trial and now apparently argue reversible error due to being allocated too few peremptory challenges—this position is untenable.

Defendants also attempt to blame this Court for admitting the criminal court verdict sheet, (Avallone Aff. p. 20, § k.), and the Newsday Article of the Event, dated October 13, 1994, (Avallone Aff., p. 21–22, § t.), when all parties stipulated in the Joint Pre-trial Order to the admissibility of these two exhibits into evidence. (Part III(A), 14, 26). These assertions are meritless.

This Court has reviewed defendants' remaining contentions and finds them to be meritless as well. Thus, the Defendant City's and Defendant Tavernier's motions for a new trial, must be, and hereby are, denied.

## VI. MOTION FOR REMITTITUR

■ In reviewing a claim for remittitur, the Court must view the evidence and draw all factual inferences in favor of the verdict winner. *Wheatley v. Ford,* 679 F.2d 1037, 1039 (2d Cir.1982). The Court must also accord "substantial deference to the jury's determination of factual issues." *Scala v. Moore McCormack Lines, Inc.,* 985 F.2d 680, 683 (2d Cir.1993) (citations omitted). The traditional federal standard for remittitur is that a remittitur should be granted only "where the damages awarded

are so excessive 'as to shock the judicial conscience.'" *Scala,* 985 F.2d at 683 (citing *Wheatley,* 679 F.2d at 1039). Furthermore, the Second Circuit has made clear that the task of the Court is not to balance the number of high and low awards and reject the verdict if the number of lower awards is greater, but rather to inquire whether the verdict is within a reasonable range. *Ismail v. Cohen,* 899 F.2d 183, 187 (2d Cir.1990).

■ Defendants argue that this Court should apply New York's standard for reviewing jury verdicts. This standard provides that a jury's verdict will be set aside if it "deviates materially from what would be reasonable compensation," pursuant to CPLR § 5501(c). However, as the Second Circuit has held, jury verdicts for claims arising under a federal statute must be held to the traditional federal standard of review. *Scala,* 985 F.2d at 683, n. 7; *See also Wheatley,* 679 F.2d at 1039 (applying federal standard to claim arising under Civil Rights Act, Section 1983). Assuming *arguendo* that the New York standard applies, this Court still finds that the awards may not be said to deviate materially from what would be reasonable compensation.

■ Under New York law, damages for false arrest are to compensate for injuries from the beginning of custody to arraignment, and damages for malicious prosecution are to compensate for injuries after arraignment. *Peterson,* 995 F.Supp. at 320.

■ This award of $300,000 for false arrest and detention until arraignment does not shock the conscience in light of the circumstances. *See Ismail,* 899 F.2d at 187 (reversing district court's remittitur on jury award for compensatory damages totaling $650,000 and punitive damages totaling $150,000 due to the "misconduct of a New York City policy officer" resulting in a successful Section 1983 claim, and battery, false arrest, malicious prosecution and abuse of process state claims); *Hughes v. Patrolmen's Benevolent Ass'n,*

850 F.2d 876, 883 (2d Cir.1988) (affirming overall damages of $575,000 against police officer Burns and Police Benevolent Association, including $125,000 for intentional infliction of emotional distress by police officer even though no permanent harm resulted from harassment). The jury's award of $300,000 is therefore within a reasonable range. Moreover, defendants have not set forth any case with similar facts to this one in support of their motion for remittitur. Particularly lacking is any case in which the conduct of the defendant officer was as egregious as in the instant case.

Plaintiff, concerned for the dangers his tractor-trailer on the expressway posed, attempted to gain police help and remedy the dangerous condition. As an innocent citizen, seeking help from police, plaintiff was not helped but rather obstructed by defendant police officer. Plaintiff was then sworn at repeatedly by this officer, threatened with death, threatened with a gun, and held at gunpoint during this false arrest. Plaintiff suffered great humiliation, indignation, and fear in being arrested and detained under these circumstances. Moreover, an article was published on the front page of the Long Island section of Newsday soon thereafter stating that plaintiff was arrested for assaulting a police officer. The harm to plaintiff's reputation was great—plaintiff was alienated by friends and co-workers. This arrest also led to a prosecution. Considering all these factors, especially the obstructing conduct of the defendant officer Tavernier, the jury's verdict may not be said to shock the conscience.

■ The award of $322,000 for malicious prosecution also does not shock the conscience. Due to this prosecution, plaintiff suffered loss of sole custody of his then fourteen year old daughter, loss of a well paying job (he has since always made at least $15,000 less than his original job); plaintiff was also forced to endure more public humiliation, 28 criminal court appearances including a nine day criminal trial, legal expenses, and understandably, the pain and suffering from the anxiety of facing possible incarceration. *See Vitale v. Hagan,* 132 A.D.2d 468, 517 N.Y.S.2d 725 (1st Dep't 1987), *modified on other grounds,* 71 N.Y.2d 955, 528 N.Y.S.2d 823, 524 N.E.2d 144 (1988).

The court in *Vitale* affirmed a $750,000 in damages for malicious prosecution in a case very similar to the instant case. Plaintiff Vitale and defendant New York City police sergeant Hagan had an altercation involving a minor automobile mishap. This altercation resulted in police sergeant Hagan arresting Vitale and charging him with assault and resisting arrest. The criminal charges were later dismissed.

Plaintiff Jocks suffered more from the malicious prosecution claim than the plaintiff in *Vitale.* In the instant case, the criminal charges were not dismissed, but rather plaintiff was forced to submit to a nine day criminal trial by a jury. Moreover, plaintiff lost sole custody of his daughter and his job. Thus, the subsequent jury award of $322,000 is within range of prior awards and may not properly be remitted.

The Defendant City's and Defendant Tavernier's motions for remittitur must be, and hereby are, denied.

## VII. QUALIFIED IMMUNITY

■ Qualified immunity is an affirmative defense, which, if proven shields government employees from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir.1995). No party disputes that false arrest does not violate established statutory or constitutional rights. However, even if plaintiff's rights are clearly established, the actor is nonetheless protected from liability if it was "objectively reasonable" for him to believe that his actions were lawful at the time of the acts. *Id.*

Defendants would have the Court believe that reasonable persons in defendant's position would not have understood that their conduct (i.e. obstructing plaintiff from calling 911, swearing at plaintiff, threatening plaintiff verbally and with a gun, then arresting plaintiff in his attempt to flee, and misrepresenting facts to Nassau Police) was within the scope of the established prohibition. This conduct is not, to say the least, "objectively reasonable." *See Ricciuti v. NYC Transit Authority*, 124 F.3d 123, 128–131 (2d Cir. 1997) (reversing grant of summary judgment in a Section 1983 case based on qualified immunity because if police knew no probable cause and police falsified evidence, not objectively reasonable to arrest and to prosecute). Defendant Tavernier is therefore not entitled to the defense of qualified immunity.

### CONCLUSION

Plaintiff Thomas Jocks' motion for sanctions against Defendants City of New York and the New York City Police Department is GRANTED. The City's cross-motion for sanctions is DENIED. The City's motion for recusal of this Court is DENIED.

The City's motions for reconsideration of this Court's assertion of jurisdiction over the indemnification cross-claim is DENIED. Defendant Tavernier's motion for indemnification on his cross-claim against the City is DENIED.

The City's motions and Tavernier's motions: (1) for vacatur of the judgment against defendant Tavernier as a matter of law; (2) for a new trial; and (3) for remittitur of judgment against defendant Tavernier are all DENIED.

SO ORDERED.